**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and MCMILLIAN, J.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**March 5, 2015**

# In the Court of Appeals of Georgia

A14A2129. IN THE INTEREST OF C. M., a child.                    PH-077 C

PHIPPS, Chief Judge.

This appeal arises from a disposition order of the Juvenile Court of Polk County placing C. M., then 14 years old, in the custody of the Department of Juvenile Justice ("DJJ") for an initial period of up to 36 months, with 12 months of the custodial period to be spent in restrictive custody in a facility managed by the Georgia Department of Corrections. C. M. contends that: (1) the juvenile court's decision to revoke a prior sentence of probation and to place him in restrictive custody was arbitrary and "precludes treatment and rehabilitation in a less restrictive setting"; (2) his due process rights were violated when the court, in entering the disposition order, relied on a document that was "attached [to] and made a part of the decision, after the conclusion of the disposition hearing"; and (3) the juvenile court violated his Fifth

Amendment rights by commenting on his failure to testify or to deny that he had committed an offense. We affirm.

Viewed in favor of the juvenile court's order,[1] the record shows the following. On August 21, 2013, a petition was filed in the Juvenile Court of Polk County, alleging that on May 23, 2013, C. M. committed acts that, if committed by an adult, would have constituted the offenses of simple battery, obstruction of an officer, and disrupting a public school. Subsequently, on January 2, 2014, another petition was filed in the Juvenile Court of Polk County, alleging that between December 28, 2013 and December 29, 2013, C. M. was a runaway child and was ungovernable, and that on December 29, 2013, he committed an act that, if committed by an adult, would have constituted the offense of aggravated assault.[2]

On February 27, 2014, C. M. entered admissions to acts alleged in both the August 2013 and January 2014 petitions. Regarding the August 2013 petition, C. M. admitted that on May 23, 2013 he had committed an act that, if committed by an adult, would have constituted the offense of obstruction of an officer, in that he refused to comply with an officer's lawful command to "move" when the officer was

---

[1] See *In the Interest of D. C.*, 324 Ga. App. 95 (748 SE2d 514) (2013).

[2] OCGA § 16-5-21.

2

attempting to escort him out of the school principal's office. The state dismissed the simple battery and disrupting public school allegations. Regarding the January 2014 petition, C. M. admitted that on December 29, 2013 he had committed an act that, if committed by an adult, would have constituted the offense of aggravated assault, in that he did "make an assault upon [his brother ] with a deadly weapon, to wit: a pocket knife by pointing the knife at him and saying '[I] have something for you.'"[3] The state dismissed the runaway and ungovernable allegations of the January 2014 petition. The juvenile court entered a disposition of probation for 24 months, and noted that "[t]he State announced it did not wish to seek any restrictive custody on the Designated felony offense."

On March 24, 2014, a petition was filed in the Juvenile Court of Polk County, alleging that on March 7, 2014 C. M. committed three acts of violation of probation, three acts of contempt of juvenile court, and acts that, if committed by an adult, would have constituted the offenses of two counts of making terroristic threats. As to the latter charges, the petition alleged that C. M. "did threaten to commit aggravated assault a crime of violence, with the purpose of terrorizing [a teacher ]," and that he

---

[3] This act constituted a class B designated felony act, as there was no evidence or allegation that the act actually resulted in serious bodily injury. See OCGA § 15-11-2 (13) (A); OCGA § 16-5-21 (b) (2).

"did threaten to damage, by 'shooting up, a residence, the property of [the teacher], with the purpose of terrorizing [the teacher]." When the petition was filed, C. M.'s whereabouts were unknown, and a warrant was issued for his arrest and detention; C. M. was placed in detention on March 18, 2014. The state subsequently filed a motion to revoke the disposition of probation previously entered on the delinquent act of aggravated assault, a class B designated felony act, and to resentence him on that charge.

On April 3, 2014, C. M. was adjudicated delinquent for committing on March 7, 2014 two acts of contempt of court, two acts of violation of probation, and for committing acts that, if committed by an adult, would have constituted the offenses of two counts of making terroristic threats. C. M. was acquitted of one act of violation of probation and of one act of contempt. The court continued disposition in order for a behavioral health evaluation to be completed, "to provide the juvenile court with information and recommendations relevant to the behavioral health status and mental health treatment needs" of C. M. The court ordered that C. M. would "remain in Rome RYDC pending disposition, at his request." A psychological evaluation was filed with the court, and the next day, a disposition hearing was held.

At the disposition hearing, the school resource officer, a police officer with the Rockmart Police Department, testified regarding school disciplinary records for C. M. spanning the period from November 2012 to C. M.'s expulsion from school in March 2014. A copy of C. M.'s school disciplinary report was admitted in evidence without objection. The report showed log entries for C. M., including acts of defiance of authority, fighting, inappropriate behavior, threats, "Bullying/Profanity," and for the terroristic threats incident which, the report showed, led to C. M.'s expulsion from school. Printouts from C. M.'s Facebook page were admitted in evidence, two of which showed C. M. holding what appeared to be a firearm. The officer testified that he was aware that C. M. had been expelled from school, believed that C. M. could benefit from being in an institution that could offer him an educational program, and believed that C. M. should be held in restrictive custody. When questioned on cross-examination about "other educational alternatives that are out there," such as "online schooling" and "home schooling," the officer responded, "as far as the homeschooling, let's be honest, [C. M.'s mother] didn't even know he was gone or where he was at, so I don't think he's going to be getting any homeschooling." The teacher who was the victim of the terroristic threats testified that she felt "[s]cared" after the incident, and that she would not want C. M. to be out of restrictive custody.

C. M.'s probation officer testified that C. M. had not been on probation long enough for her to get to know him before the terroristic threats incident occurred and C. M. was placed in detention. The probation officer testified that one of her contacts at the RYDC informed her that C. M. had been "written up" on March 25 for being involved in a fight. The probation officer testified that she had not completed a current "DAI"[4] or "risk assessment" on C. M., but that she could later furnish one to the court. Notwithstanding, the probation officer testified that, in her estimation and based on her knowledge of the acts for which C. M. had been adjudicated delinquent, C. M.'s DAI score would be close to 20, which would place him in a high risk level classification.[5] The court asked the probation officer to "run [a DAI] and get one to me, and furnish it to everybody else so they'll have one," by 5:00 the next day. Immediately thereafter, the court informed C. M., through his counsel, that it did not anticipate making a ruling on the state's request for restrictive custody until it had received a current DAI for C. M., as one of the factors the court had to consider was

[4] "DAI" is an initialism for "Detention Assessment Instrument." A Detention Assessment Instrument is a tool used to calculate a child's risk level, and aid in a detention decision.

[5] A child with a detention assessment score of 12 or more on the DAI is classified as "High Risk," and detention is recommended.

the "risk level of such child that is calculated by a risk assessment." Counsel did not object in any way; she replied, "I understand that." At the end of the hearing, the court reiterated that it was asking DJJ to provide a current DAI, and the court would "get an order out by no later than next Friday."

In the psychological evaluation, the psychologist wrote that there were "few pro-social role models for [C. M.] since he is part of a gang and both of his elder brothers are incarcerated. It is unclear what role his mother's boyfriend plays in the family and his maternal grandfather is apparently quite sick, however, [C. M.] is in need of a strong pro-social role model." The psychologist continued: "[t]here are currently no educational plans in place for [C. M.] and he reportedly still experiences some problems with anger. Without any direction in life it is likely that [C. M.] will continue to act in ways that result in interventions from law enforcement. Hence, a very structured program of activity is needed."

1. C. M. contends that the juvenile court's decision to revoke a prior disposition of probation and to place him in restrictive custody was arbitrary and "precludes treatment and rehabilitation in a less restrictive setting," in violation of OCGA § 15-11-504.

Subdivision (a) of OCGA § 15-11-504 lists places where "an alleged delinquent child may be detained," and subdivision (b) provides that "Placement shall be made in the least restrictive facility available consistent with the best interests of the child." But as C. M. had already been adjudicated delinquent, OCGA § 15-11-504 was not applicable to his disposition.

Regarding the issue of whether a juvenile should be placed in restrictive custody, OCGA § 15-11-602 (a) and (b) pertinently provide: "When a child is adjudicated to have committed a . . . class B designated felony act, the order of disposition shall . . . include a finding, based on a preponderance of the evidence, of whether such child requires placement in restrictive custody." OCGA § 15-11-602 (b) further expressly provides that in determining whether placement in restrictive custody is required, the court shall consider and make specific written findings of fact as to each of the following factors, pertinently:

> (1) The age and maturity of such child; (2) The needs and best interests of such child; (3) The record, background, and risk level of such child as calculated by a risk assessment, including, but not limited to, information disclosed in the probation investigation, diagnostic assessment, school records, and dependency records; (4) The nature and circumstances of the offense, including whether any injury involved was inflicted by such child or another participant, the culpability of such

8

child or another participant in planning and carrying out the offense, and the existence of any aggravating or mitigating factors; (5) The need for protection of the community; [and] (6) The age and physical condition of the victim.

In this case, the juvenile court made findings as to each factor set forth above, and C. M. does not contend otherwise. "The weight to be accorded each factor, and the ultimate decision about whether restrictive custody is warranted, is committed to the sound discretion of the juvenile court."[6]

As it concerns the first factor, the age and maturity of the child, the court found that C. M. was 14 years old, was "extremely immature," was "susceptible to temptations to follow a 'gangster' lifestyle," and had had multiple "run-ins" with authority figures. As to the second factor, the needs and best interests of the child, the court found that according to the psychological evaluation, C. M. has had no positive male role models in his life. Referring to C. M.'s school disciplinary report, the court also found that C. M. had been permanently expelled from school, based on "a series of aggressive and violent behavior" in incidents wherein he displayed "inappropriate behavior, defiance of authority, fighting, threats, bullying, and/or profanity, and the

---

[6] *In the Interest of D. C.*, supra at 98 (citation and punctuation omitted).

9

terroristic threats incident for which he was adjudicated [delinquent]." The court found that C. M. appeared to have no structure in his life, and that his mother had admitted that she could not control him. The court found that photographs printed from C. M.'s Facebook page depicted C. M. with what appeared to be an automatic pistol and other firearms, making menacing gestures, and with what appeared to be a marijuana cigarette "hanging out of his mouth."

The court found that the psychologist who conducted the psychological evaluation recommended individual and family therapy and a structured educational program, and that the psychologist opined that "without any direction in his life, it is likely that [C. M.] will continue to act in ways that result in interventions from law enforcement." The court found that the psychological evaluation reflected that C. M. had admitted using marijuana and being involved in gang activity for a number of years, and that the school resource officer had also testified about possible gang involvement. The court noted that, "[s]trangely, however, [the psychologist] does not recommend detention, despite [his] findings regarding gang activity, a need for structure, and a history of aggressive behavior." The evidence led the court to conclude that C. M. "desperately needs structure, discipline, and positive male role

models in his life, to stay away from temptations to commit crimes," and that the needed structure could only be provided in detention.

As it concerns the third factor - the record, background, and risk level of the child - the court noted that it had recounted C. M.'s record when it made findings as to the first two factors. The court found that according to C. M.'s probation officer, C. M.'s risk assessment score was close to 20, which placed C. M. at a high risk level, and that, consistent with the probation officer's testimony, a completed DAI document the probation officer provided to the court after the disposition hearing showed that C. M.'s DAI score was 21, indicating a high risk level.

As to the fourth factor, the nature and circumstances of the offense, the court reiterated the acts upon which C. M. had been adjudicated delinquent, pointing out that C. M. had sent a text message threatening to shoot up the house of one his teachers. The court found that the teacher was not injured as a result of the act, but that she was afraid of C. M., that she was visibly nervous and shaking during the disposition hearing, and that she did not want to be around C. M. The court observed that C. M. did not testify at the disposition hearing, but that he had never denied sending the threatening text message; the court found that it appeared that C. M. had sent the threatening message himself and that no other persons were involved. The

court found it significant that two witnesses who had testified at the adjudication hearing were "extremely reluctant to do so, and one even had to be threatened with contempt if he did not answer the State's questions." The court found that the incident involving the terroristic threats had occurred just ten days after C. M. had been placed on probation for aggravated assault. The court found that C. M. did not present any mitigating factors to the court.

As to the fifth factor, the court found that the need for protection of the community was "significant." The court found that C. M. had been expelled from school, and had "no other activities or interests that occupy him during the day," leaving C. M. "essentially free to roam the streets of the City and do as he pleases." The court found that C. M.'s Facebook photographs showed that he led a dangerous life; that C. M. had been involved in an altercation with his brother with a knife; that C. M. had obstructed law enforcement officers in the discharge of their official duties; and that many of the witnesses who testified were afraid of C. M. As it concerns the sixth factor, the age and physical condition of the terroristic threats victim, the court found that the victim had not been injured.

Based on the court's findings with regard to the requisite factors, the court concluded that restrictive custody was appropriate, and that it was in C. M.'s "best

12

interest to receive control and assistance to prevent him from entering the adult system." In this case, the court was authorized to find that C. M.'s school disciplinary record; record of delinquency including acts of violence, aggression, and intimidation; violations of probation while living at home; immaturity; susceptibility to temptation; use of marijuana; lack of positive male role models in his life; lack of structure in his life; expulsion from school; and absence of other activities to occupy his time during the day demonstrated that restrictive custody was in his best interests, as well as the community's, and was not arbitrary.[7]

Therefore, we conclude that the court complied with OCGA § 15-11-602 (a) and (b), and that the court did not abuse its discretion in ordering C. M. to serve 12 months in restrictive custody.[8]

2. C. M. contends that his due process rights were violated when the court, in entering the disposition order from which this appeal is taken, relied on a DAI

---

[7] See id. at 99.

[8] See generally id.; *In the Interest of C. T.*, 197 Ga. App. 300, 302 (2) (398 SE2d 286) (1990) (adjudication for a designated felony act authorized juvenile court to place child in restrictive custody despite recommendations for non-restrictive custody). See also OCGA § 15-11-602 (d) (1) (child adjudicated for a class B designated felony act may be placed in DJJ custody for "an initial period of up to 36 months; provided, however, that not more than 18 months of such custodial period shall be spent in restrictive custody").

document that was "attached [to] and made a part of the decision, after the conclusion of the disposition hearing."

As C. M. states in his appeal brief (and the evidence established), the probation officer testified that C. M. "had a DAI score of about 20, placing him in the high risk category." Therefore the introduction of the DAI document, even if error, was merely cumulative of the probation officer's testimony, and presents no basis for reversal.[9] Moreover, "[C. M.] cannot object to the admission of evidence for the first time on appeal."[10] At the disposition hearing, counsel for C. M. never objected in any manner to the court's ruling that it would issue an order after it had received the DAI document from the probation officer.[11]

---

[9] See generally *Baghose v. State*, 309 Ga. App. 599-600 (1) (711 SE2d 110) (2011). See also *Welch v. State*, 237 Ga. 665, 676 (12) (229 SE2d 390) (1976) ("Where the evidence erroneously admitted is merely cumulative of properly admitted evidence, no harm is suffered by the accused.") (citations omitted); *In the Interest of M. E. A.*, 253 Ga. App. 531, 533 (2) (559 SE2d 759) (2002) ("harm as well as error must be shown in order for us to reverse the juvenile court's adjudication") (footnote omitted); *In the Interest of C. T.*, supra at 301 (1) ("Harm as well as error must be shown to authorize reversal.") (citation omitted).

[10] *Lambert v. Jones*, 250 Ga. 603, 606 (299 SE2d 716) (1983) (citations omitted).

[11] See id. at 605-606.

14

3. C. M. contends that the juvenile court violated his Fifth Amendment right to remain silent by commenting on his failure to testify or failure to deny that he had committed an offense. In the division of the disposition order entitled "The Nature and Circumstances of the Offense," the juvenile court wrote, inter alia, that: "The child did not testify in the hearing, but has never denied sending the messages."

One of the factors the court must consider and with regard to which the court must make specific written findings of facts is: "The nature and circumstances of the offense, including whether any injury involved was inflicted by such child or another participant, the culpability of such child or another participant in planning and carrying out the offense, and the existence of any aggravating or mitigating factors."[12]

The complained-of comment was followed by: "It appears that the child sent the threat himself, that no other offenders were involved." At the end of the paragraph that included both sentences the court concluded, "The child did not present any mitigating factors." A fair reading of the complained-of remarks, in context, establishes that they were not addressed to C. M.'s exercise of his fundamental right, but to the court's determination of whether C. M. had acted alone (or with another participant), and to the existence of aggravating or mitigating evidence; the juvenile

---

[12] OCGA § 15-11-602 (b) (4).

15

court was required to make such factual findings in rendering its disposition.[13] We find no error.

*Judgment affirmed. Ellington, P. J., and McMillian, J., concur.*

---

[13] See generally *Wakily v. State*, 225 Ga. App. 56 (8) (483 SE2d 313) (1997); *Cottingham v. State*, 213 Ga. App. 637 (1) (445 SE2d 384) (1994).